J-S46014-16

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| IN THE INTEREST OF: N.A.S., A MINOR | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: A.J.R., FATHER | No. 71 EDA 2016 |

Appeal from the Decree December 14, 2015
In the Court of Common Pleas of Philadelphia County
Family Court at No(s): CP-51-AP-0000855-2015

BEFORE: BENDER, P.J.E., OTT, J., and STRASSBURGER, J.[*]

MEMORANDUM BY BENDER, P.J.E.:          **FILED AUGUST 02, 2016**

Appellant, A.J.R. (Father), appeals from the decree involuntarily terminating his parental rights to his daughter, N.A.S., born in October of 2013. Upon careful review, we affirm.[1]

We summarize the relevant facts and procedural history as follows. On December 24, 2013, the Philadelphia Department of Human Services, Children and Youth Division (DHS), obtained an order of protective custody for N.A.S. On the previous day, N.A.S. was brought by her maternal great-grandmother and maternal aunt and admitted to St. Christopher's Hospital because she "was listless and not eating properly." Trial Court Opinion, 3/2/16, at 1.[2] Upon admittance to the hospital, it was determined that

_____

[*] Retired Senior Judge assigned to the Superior Court.

[1] We note that the Child Advocate filed a brief in this matter in support of the decree involuntarily terminating Father's parental rights.

[2] The trial court's opinion is unpaginated. For ease of reference, we have assigned numbers to the pages of the court's opinion.

N.A.S. was dehydrated and hypothermic, and had an altered mental status. *Id.* At that time, the identity of Father was unknown to DHS. *Id.* at 2.

N.A.S. was discharged from the hospital on January 2, 2014. She was placed in a foster home where she continued to reside at the time of the subject proceedings. *Id.* at 2. N.A.S. was adjudicated dependent on January 14, 2014.

Sometime prior to January 28, 2014, M.S. (Mother) identified Father as N.A.S.'s biological father. *Id.* DHS established the following Single Case Plan (SCP) objectives for him: to comply with mental health therapy and recommendations; to participate in anger management; to comply with visitation with N.A.S.; to maintain housing; and to comply with Community Umbrella Agency (CUA) services. N.T., 12/14/15, at 16. Further, the trial court ordered Father to participate in a parenting capacity evaluation. *Id.*

On November 30, 2015, DHS filed a petition for the involuntary termination of Father's and Mother's parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(1), (2), (5), (8), and (b). A hearing was held on December 14, 2015, during which DHS presented the testimony of Melonie Handberry, the Asociación Puertorriqueños en Marcha (APM) CUA case management supervisor, and Julie Cannon, the APM CUA case aide, who supervised Father's visits with N.A.S. Father testified on his own behalf.

By decree dated and entered on December 14, 2015, the trial court involuntarily terminated Father's parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(1), (2), and (b). On January 5, 2016, Father timely filed a notice of

appeal and a concise statement of errors complained of on appeal pursuant to Pennsylvania Rule of Appellate Procedure 1925(a)(2)(i) and (b).[3] The trial court filed a Rule 1925(a) opinion on March 2, 2016.

On appeal, Father presents the following issues for our review:

1. Whether the trial court committed reversible error, when it involuntarily terminated [F]ather's parental rights where such determination was not supported by clear and convincing evidence under the [A]doption [A]ct, 23 Pa.C.S.A. § 2511(a)(1) and (2)[?]

2. Whether the trial court committed reversible error, when it involuntarily terminated [F]ather's parental rights without giving the primary consideration to the effect that the termination would have on the developmental, physical and emotional needs of the child as required by the [A]doption [A]ct, 23 Pa.C.S.A. § 2511(b)[?]

3. Whether the trial court erred because the evidence was overwhelming and undisputed that [F]ather demonstrated a genuine interest and sincere, persistent, and unrelenting effort to maintain a parent-child relationship with his child[?]

Father's brief at 8.

We consider Father's issues mindful of our well-settled standard of review.

The standard of review in termination of parental rights cases requires appellate courts to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law

_____

[3] By separate decree entered on the same date, the trial court involuntarily terminated Mother's parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(1), (2), (5), (8), and (b). Mother did not appeal from the decree.

or abused its discretion. A decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. The trial court's decision, however, should not be reversed merely because the record would support a different result. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings.

*In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013) (citations and quotation marks omitted).

Termination of parental rights is governed by Section 2511 of the Adoption Act, 23 Pa.C.S.A. §§ 2101-2938, which requires a bifurcated analysis.

Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*In re L.M.*, 923 A.2d 505, 511 (Pa. Super. 2007) (citations omitted). The burden is upon the petitioner to prove by clear and convincing evidence that the asserted statutory grounds for seeking the termination of parental rights are valid. *In re R.N.J.*, 985 A.2d 273, 276 (Pa. Super. 2009).

Instantly, the trial court terminated Father's parental rights pursuant to Section 2511(a)(1), (2), and (b), which provide as follows:

> **(a) General Rule**.—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
> > (1) The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.
> >
> > (2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.
>
> . . .
>
> **(b) Other considerations.**—The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511(a)(1), (2), (b).

To meet the requirements of Section 2511(a)(1), "the moving party must produce clear and convincing evidence of conduct, sustained for at least the six months prior to the filing of the termination petition, which

reveals a settled intent to relinquish parental claim to a child or a refusal or failure to perform parental duties." ***In re Z.S.W.***, 946 A.2d 726, 730 (Pa. Super. 2008) (citing ***In re Adoption of R.J.S.***, 901 A.2d 502, 510 (Pa. Super. 2006)). The court must then consider "the parent's explanation for his or her conduct" and "the post-abandonment contact between parent and child" before moving on to analyze Section 2511(b). ***Id.*** (quoting ***In re Adoption of Charles E.D.M.***, 708 A.2d 88, 92 (Pa. 1998)).

This Court has explained that a parent does not perform his or her parental duties by displaying a "merely passive interest in the development of the child." ***In re B.,N.M.***, 856 A.2d 847, 855 (Pa. Super. 2004) (quoting ***In re C.M.S.***, 832 A.2d 457, 462 (Pa. Super. 2003)). Rather, "[p]arental duty requires that the parent act affirmatively with good faith interest and effort, and not yield to every problem, in order to maintain the parent-child relationship to the best of his or her ability, even in difficult circumstances." ***Id.*** (citation omitted).

To terminate parental rights pursuant to Section 2511(a)(2), the moving party must produce clear and convincing evidence regarding the following elements: (1) repeated and continued incapacity, abuse, neglect or refusal; (2) such incapacity, abuse, neglect or refusal caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being; and (3) the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied. ***See In re Adoption of***

**M.E.P.**, 825 A.2d 1266, 1272 (Pa. Super. 2003). Parents are required to make diligent efforts towards the reasonably prompt assumption of full parental responsibilities. **In re A.L.D.** 797 A.2d 326, 340 (Pa. Super. 2002). A parent's vow to cooperate, after a long period of uncooperativeness regarding the necessity or availability of services, may properly be rejected as untimely or disingenuous. **Id.**

With respect to Section 2511(b), this Court has explained the requisite analysis as follows:

> Subsection 2511(b) focuses on whether termination of parental rights would best serve the developmental, physical, and emotional needs and welfare of the child. In **In re C.M.S.**, 884 A.2d 1284, 1287 (Pa. Super. 2005), this Court stated, "Intangibles such as love, comfort, security, and stability are involved in the inquiry into the needs and welfare of the child." In addition, we instructed that the trial court must also discern the nature and status of the parent-child bond, with utmost attention to the effect on the child of permanently severing that bond. **Id**. However, in cases where there is no evidence of a bond between a parent and child, it is reasonable to infer that no bond exists. **In re K.Z.S.**, 946 A.2d 753, 762-63 (Pa. Super. 2008). Accordingly, the extent of the bond-effect analysis necessarily depends on the circumstances of the particular case. **Id**. at 63.

**In re Adoption of J.M.**, 991 A.2d 321, 324 (Pa. Super. 2010).

In his first and third issues on appeal, Father argues that the evidence was insufficient to terminate his parental rights pursuant to Section 2511(a). Specifically, Father asserts that he has completed all of his SCP objectives, and that he has the present capacity to care for N.A.S. We disagree.

The trial court found as follows.

[P]rior to May 30, 2015, Father had unsupervised overnight visits with the child. The [CUA supervisor] testified that on or about May 30, 2015, while in the care of [F]ather the child received a cigarette burn – a press burn, to her face. The burn was not reported by [F]ather to DHS or to the foster parent[]. [F]ather did not seek medical treatment for the child's burn. The [CUA supervisor] testified that [F]ather did not appear to know how the child received the burn. [F]ather's visits reverted back to supervised visits because of the burn incident. The CUA [case aide] testified that [F]ather failed to attend all of the supervised visits because of inclement weather and transportation despite having tokens provided to him. Furthermore, the CUA worker [ ] testified that it would not be appropriate, based on her interactions with [F]ather, for the child to have unsupervised visits with him.

Trial Court Opinion, 3/2/16, at 4 (citations to record omitted).

In addition, the court found that Father was aware of his SCP objectives, but that he "was not fully compliant with any of them." *Id.* at 3 (citations to record omitted). The trial court explained:

[F]ather did not complete anger management classes. He was referred for anger management classes numerous times. [F]ather expressed to the DHS social worker that he believed that he did not need anger management. Furthermore, [F]ather has not been compliant with his mental health treatment and medication management goals. Moreover, [F]ather did not complete his parenting capacity evaluation. The DHS worker personally delivered an appointment letter for the parenting capacity evaluation. She also called [F]ather and texted him to remind him to attend the evaluation, however, [F]ather did not go to the appointment or complete the evaluation. Lastly, both the DHS social worker and the CUA worker testified that [F]ather did not consistently visit with the child.

*Id.* (citations to record omitted). The testimonial evidence supports the court's findings.

Ms. Handberry testified that, at an unspecified time in this case, Father had been compliant with his SCP objectives, and he was granted overnight visits. N.T., 12/14/15, at 19. She explained that his visits reverted to supervised following an incident on May 30, 2015, when N.A.S., then approximately nineteen months, sustained a pressed cigarette burn to her face while in Father's care during an overnight visit. *Id.* at 19-20. She testified that Father "seemed to lack awareness of how she got the burn[,] and he also didn't know how to treat her or to take her for medical care." *Id.* at 20. In fact, Ms. Handberry testified she interviewed Father and his paramour twice, "and the stories [were] not consistent. And neither one seemed to know how [N.A.S.] got the burn." *Id.* Further, she testified Father relied on his paramour with respect to how to treat the burn, and his paramour "told him that Neosporin is fine and she'd be okay." *Id.* at 21.

Ms. Handberry testified she is concerned about Father's parenting capacity due, in large part, to the burn incident, and by his acknowledgment that his paramour would be the primary caretaker of N.A.S. if the child is returned to him. *Id.* at 22, 24. Further, she testified Father is inconsistent with his supervised visitation. *Id.* at 22-23. She testified that Father spends time in New York.[4] *Id.* at 22. She testified, at other times, he

_____

[4] Ms. Cannon, the case aide who supervises Father's visits with N.A.S., testified that Father visits New York "quite often[,]" but he has never mentioned how he gets there. N.T., 12/14/15, at 32-33.

cancels visits because of rain. *Id.* at 23. Ms. Handberry testified, "[Father] was very concerned about getting wet and the child getting wet as well. We explained to him that there are umbrellas, coats, hoods, you can still make the visit and he declined to do the visit." *Id.* Father acknowledged on direct examination that he has missed visits "[d]ue to the rain. I'm worried about my health, getting sick including my daughter's health, getting sick." *Id.* at 38. Since the last court date in January of 2015, Father scheduled twenty supervised visits, but he attended only twelve.[5] *Id.* at 29.

Besides not complying with his supervised visitation, Ms. Handberry testified that Father has never attended anger management classes, and that "he has expressed to me as well as my staff that he does not believe he needs anger management."[6] *Id.* at 17. On direct examination, Father

---

[5] Ms. Cannon testified that Father is permitted one visit per week, but that he averages two visits per month. N.T., 12/14/15, at 30-31. She testified that his reasons for not attending visits is "usually centered around transportation." *Id.* at 31. Further, Ms. Cannon testified she has explained to Father that she can give him transportation tokens. *Id.* She agreed on direct examination that Father still does not seem to understand that he can receive tokens and get to the visit. *Id.* In addition, Ms. Cannon testified that Father has lost transportation tokens. *Id.*

[6] Ms. Handberry testified that the anger management objective was assigned to Father because he "can be difficult to redirect and he can get easily frustrated and angered when being told information that he doesn't agree with. . . . [I]t was concerning because we believe that if there were any frustrations with [N.A.S.]'s care [F]ather wouldn't be able to address it and handle it." N.T., 12/14/15, at 17.

testified that he did not attend anger management classes because they were held "downtown[,]" and he lives in "Feltonville." *Id.* at 36.

In addition, Ms. Handberry testified that, at an unspecified time, Father was consistent with mental health treatment. *Id.* at 18. However, in August of 2015, after the burn incident in May of that year, the court ordered Father to obtain a parenting capacity evaluation and to attend mental health treatment consistently. *Id.* at 18-19, 22. Ms. Handberry testified that Father has not been compliant with the mental health program since October of 2015, including not completing the parenting capacity evaluation, individual therapy sessions, and medication management appointments. *Id.* at 18, 28. Father testified that the parenting capacity evaluation has been rescheduled, and that he has been prescribed medication for his anger, which he takes every day. *Id.* at 36-38.

Based on the foregoing testimonial evidence, we discern no abuse of discretion by the trial court in terminating Father's parental rights pursuant to Section 2511(a)(1) and (2). The evidence overwhelmingly demonstrates that, for at least six months preceding the filing of the termination petition, that is, since at least May of 2015, Father has failed to perform his parental duties. Further, the evidence demonstrates that Father's repeated and continued incapacity or refusal to parent and to comply with his SCP objectives has caused N.A.S. to be without essential parental care, control, or subsistence necessary for her physical or mental well-being. At the time of the termination hearing, N.A.S. had been in placement for more than

twenty-three months. We discern no abuse of discretion by the trial court in concluding that Father's incapacity or refusal to parent and to comply with his SCP objectives cannot or will not be remedied. Therefore, Father's first and third issues on appeal fail.

In his second issue, Father argues that the trial court erred in terminating his parental rights pursuant to Section 2511(b). This Court has emphasized, in part:

> While a parent's emotional bond with his or her child is a major aspect of the subsection 2511(b) best-interest analysis, it is nonetheless only one of many factors to be considered by the court when determining what is in the best interest of the child.
>
> > [I]n addition to a bond examination, the trial court can equally emphasize the safety needs of the child, and should also consider the intangibles, such as the love, comfort, security, and stability the child might have with the foster parent.

*In re Adoption of C.D.R.*, 111 A.3d 1212, 1219 (Pa. Super. 2015) (quoting *In re N.A.M.*, 33 A.3d 95, 103 (Pa. Super. 2011) (quotation marks and citations omitted)). In addition, our Supreme Court stated that, "[c]ommon sense dictates that courts considering termination must also consider whether the children are in a pre-adoptive home and whether they have a bond with their foster parents." *In re T.S.M.*, 71 A.3d 251, 268 (Pa. 2013). Moreover, the Court directed that, in weighing the bond considerations pursuant to Section 2511(b), "courts must keep the ticking clock of childhood ever in mind." *Id*. at 269. The *T.S.M.* Court observed that, "[c]hildren are young for a scant number of years, and we have an

obligation to see to their healthy development quickly. When courts fail . . . the result, all too often, is catastrophically maladjusted children." *Id*.

Ms. Handberry testified that N.A.S. resides with a kinship care foster parent, whom she refers to as "mommy," and that it is a pre-adoptive placement. N.T., 12/14/15, at 12-13. She testified that N.A.S. is "very bonded" to her foster parent. *Id.* at 26. Moreover, Ms. Cannon testified that N.A.S. does not have a bond with Father. *Id.* at 33. Ms. Handberry testified that N.A.S. would not suffer emotional harm if Father's parental rights were terminated because she "is in a wonderful home. She's bonded and she's thriving. . . ." *Id.* at 26.

To the extent that Father asserts terminating his parental rights will not serve the needs and welfare of N.A.S. because it will not "facilitate putting another bond in its place," we disagree. Father's brief at 16. Father presents no statutory or case authority to support his assertion, nor are we aware of any. The foregoing testimonial evidence demonstrates that N.A.S. has a parent-child bond with her foster mother, and that she has no bond with Father. As such, we discern no abuse of discretion by the trial court in concluding that involuntarily terminating Father's parental rights will serve the developmental, physical, and emotional needs and welfare of N.A.S. Accordingly, we affirm the decree pursuant to 23 Pa.C.S.A. § 2511(a)(1), (2), and (b).

Decree affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 8/2/2016